Gholamreza NARENJI et al., Plaintiffs,

v.

Benjamin CIVILETTI et al., Defendants.

### CONFEDERATION OF IRANIAN STUDENTS, Plaintiff,

v.

Benjamin R. CIVILETTI, Defendant.

Civ. A. Nos. 79–3189, 79–3210.

United States District Court,
District of Columbia.

Dec. 11, 1979.

---

Alan Dranitzke, Washington, D. C., Shelley Davis, Margaret Winter, Eric M. Lieberman, New York City, for plaintiff Narenji and others.

David Carliner, Washington, D. C., Bruce Ennis, New York City, of counsel, for plaintiff Confederation of Iranian Students.

Elizabeth Gere Whitaker, Brook Hedge, U.S. Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

The Court is asked to determine whether 8 C.F.R. § 214.5, *reprinted in* 44 Fed.Reg. 65,727 (1979), which requires that by December 14, 1979, all Iranian nonimmigrant postsecondary students report to the nearest Immigration and Naturalization Service office for identification and examination of status, was validly promulgated within the authority bestowed upon the executive branch by statute and the Constitution.

The cases of *Narenji v. Civiletti*, Civ.No. 79–3189 (D.D.C. filed Nov. 21, 1979), and *Confederation of Iranian Students v. Civiletti*, Civ. No. 79–3210 (D.D.C. filed Nov. 27, 1979), were consolidated on November 27, 1979, Fed.R.Civ.P. 42(a), with a full hearing on the merits held December 4, 1979. *Narenji* has been filed as a class action[1] by three nonimmigrant students from the Islamic Republic of Iran on behalf of all Iranians admitted to the United States as nonimmigrant students and affected by the questioned regulation. Plaintiffs ask for declaratory and injunctive relief against Attorney General Benjamin R. Civiletti and Acting Commissioner of Immigration and Naturalization David Crosland, seeking both a declaration that 8 C.F.R. § 214.5 is unconstitutional and an injunction against its enforcement. Section 214.5, which is set forth fully in appendix A of this memorandum opinion, is an Immigration and Naturalization Service (INS) regulation that requires all Iranian nonimmigrant students to report to INS by December 14, 1979, with evidence of their current status. Plaintiff Confederation of Iranian Students, with approximately 1500 members, also seeks a declaratory judgment and injunctive relief[2] against Attorney General Civiletti in regard to the same regulation, praying further that requests for discretionary relief made by Iranian students be treated similarly to those made by nonimmigrant students of other nationalities and that no Iranian student who has reported to INS since November 13, 1979, in compliance with the regulation or who was subject to this regulation, be deported.

This cause must be viewed in light of what has come to be recognized as an unprecedented violation of international law, overwhelmingly condemned, which commenced almost six weeks ago and which breached the absolute principle that the personnel and property of a diplomatic mission are inviolate.

On November 4, 1979, approximately 2500 Iranian demonstrators, described as "students," invaded and illegally occupied the United States Embassy in Tehran, Iran. Declaration of Warren Christopher ¶ 1, Ex-

1. A separate motion for class certification was filed on December 3, 1979, as required by Rule 1–13(c) of the Rules of the United States District Court for the District of Columbia. There being no opposition from defendants and the matter being appropriate for disposition under Federal Rules of Civil Procedure 23(b)(1) and 23(b)(2), the motion was granted at the time of the hearing. The class certified in this action consists of all nonimmigrant students from the Islamic Republic of Iran admitted to the United States pursuant to an F–1 or J–1 visa who were required by 8 C.F.R. § 214.5 to report to the Immigration and Naturalization Service (INS) before December 14, 1979, to provide information as to their residence and nonimmigrant student status.

A motion to intervene, filed by Andrew Pulley on December 3, 1979, pursuant to Federal Rule of Civil Procedure 24 was denied on the record at the hearing as untimely and because there was an insufficient showing by his counsel, who also represented the *Narenji* plaintiffs, that the disposition of this action would impair Mr. Pulley's interests.

As to the plaintiffs' motion for expedited discovery in *Narenji*, the matter is now moot. The Government previously had agreed to supply the documents available, subject to any privilege claimed.

2. Plaintiff originally sought both a temporary restraining order and a preliminary injunction but agreed, pursuant to Federal Rule of Civil Procedure 65(a)(2), to have the entire case heard on the merits on December 4, 1979.

hibit 7 to Memorandum of Points and Authorities in Opposition to Plaintiffs' Motions for Injunctive Relief, *Narenji v. Civiletti,* Civ. No. 79–3189 (D.D.C. filed Nov. 30, 1979) [hereinafter referred to as Christopher Declaration]. Approximately sixty-five American citizens working in the embassy compound were taken hostage in an attempt to force this country to agree to certain demands that have been recognized as unacceptable. *Id.* Although some of the hostages were released just prior to Thanksgiving Day, fifty are reportedly still being held.

The hostages' captors, estimated to number from three to four hundred within the embassy compound, have threatened to kill the hostages if there is any attempt to free them. *Id.* Demonstrations outside the compound have been held on almost a daily basis and at times have involved tens of thousands of demonstrators. *Id.*

Despite its commitment to do so, the government of Iran has failed to take action to protect the embassy or its personnel. *Id.* ¶ 3. Following the embassy takeover, the Prime Minister and a large number of cabinet officers resigned. *Id.* A new cabinet has been named, but the successor government has been unwilling to secure the safe release of all hostages or to meet with the United States' emissaries dispatched to secure the release of the hostages. *Id.* The students inside the compound have rigidly refused to moderate their demands. *Id.*

The violent actions in Iran have not only outraged all Americans, but have been universally condemned by other nations throughout the world. While a United Nations Security Council meeting convened to help negotiate a release of the hostages proved fruitless because of the refusal of Iran to participate, the President of the council has made public statements on behalf of its members, appealing for the immediate release of all hostages.

During the crisis, the President has conferred daily, and often several times a day, with Secretary of State Cyrus Vance and other senior officials of the Administration.

*Id.* ¶ 5. Recognizing the growing anger among our citizens, the President issued a statement to the nation on November 9, 1979, urging all public officials and private citizens to exercise restraint and appealing to "every American to refrain from any action that might increase the danger to the American hostages [in Tehran]." White House Statement on American Hostages in Iran, 15 Weekly Comp. of Pres. Doc. 2101, 2102 (Nov. 9, 1979).

As the grave situation continued to escalate with increasing threats by the Iranian captors and a mounting clamor echoing from the demonstrators outside our embassy in Tehran, President Carter on November 10, 1979, directed the Attorney General to "identify any Iranian Students in the United States who are not in compliance with the terms of their entry visas, and to take the necessary steps to commence deportation proceedings against those who have violated applicable immigration laws and regulations." Announcement on Actions To Be Taken by the Department of Justice, 15 Weekly Comp. of Pres. Doc. 2107, 2107 (Nov. 10, 1979); Christopher Declaration ¶ 6. This directive was one of several measures taken in response to the grave international crisis created by the detention of the American hostages. Others have included presidential orders that oil produced in Iran not enter the United States, Pres. Proc. No. 4702, 44 Fed.Reg. 65,581 (1979), and that, a national emergency existing, the assets of Iran located in this country be frozen, Exec. Order No. 12,170, 44 Fed.Reg. 65,729 (1979). Throughout, the President has emphasized the gravity of the crisis and commented on the necessity for Americans to maintain constraint, despite the intensity of emotion. On November 13, 1979, in response to the President's November 10 directive and acting, as expressed, pursuant to his powers under the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. §§ 1103(a), 1184(a) (1976), the Attorney General issued the challenged regulation, 8 C.F.R. § 214.5, to be effective immediately and to be applicable only to

**1136**

Iranian students.[3] The regulation directs Iranian nonimmigrant postsecondary students to report to INS by December 14, 1979, with evidence of their residence and student status, including their passport, a letter of good-standing from their school, and evidence of their current address. Failure to comply or willfully supplying false information would subject such students to immediate deportation proceedings. The notice and comment and delayed effective date provisions of 5 U.S.C. § 553 specifically were waived in the announcement concerning the regulation as being impracticable and contrary to the public interest.

The *Narenji* plaintiffs' main challenge to the regulation is that it is violative of the fifth amendment because defendants have singled out only Iranian students. They claim that this constitutes discrimination on the basis of national origin, a suspect class, requiring strict judicial scrutiny and a compelling governmental objective in order to pass constitutional muster. Those plaintiffs also contend, however, that the regulation violates the fourth amendment because the "compelled interrogation" by INS officials constitutes an illegal seizure in that INS has no reasonable grounds to suspect that a particular Iranian student may have violated the conditions of his or her nonimmigrant status. Further, plaintiffs in *Narenji* claim section 214.5 violates the first amendment, alleging that the primary purpose of the regulation at issue was both to punish Iranian students in the United States for past demonstrations and to chill the future exercise of their rights of speech, association, and assembly. An additional cause of action in plaintiffs' amended complaint asserts defendants' failure to comply with the notice and comment provisions of the Administrative Procedure Act, 5 U.S.C. § 553, and the lack of statutory authority for the regulation. Plaintiff Confederation of Ira-

nian Students similarly challenges the issuance of the regulation as violative of the Administrative Procedure Act in that the notice and comment procedure was improperly waived and because the Attorney General exceeded the authority vested in him under the Immigration and Nationality Act. That plaintiff also alleges defendant Civiletti's action violates tenets of international law and the first and fifth amendments.

Addressing these allegations of invalidity, defendants contend that the waiver of notice and comment was appropriate, as were the terms of the regulation itself, which, they say, were proper under the authority given to the Attorney General pursuant to section 1103(a) of title 8, which gives the Attorney General the power to administer and enforce all laws relating to alien immigration and naturalization, and 8 U.S.C. § 1184(a), which prescribes the power of the Attorney General to issue regulations to govern the admission of nonimmigrant aliens and to insure the departure of those individuals who violate the terms of their nonimmigrant status. Defendants also assert that the regulations cannot be found to violate the fifth amendment in that the foreign policy determinations of the President and the Attorney General are not subject to judicial review, and, in any event, any discrimination involved is justified by compelling governmental objectives. Further, they contend that there has been no fourth amendment violation in that no "seizure" of the students has occurred and that the failure of plaintiffs to show any impermissibly selective enforcement of the regulation dooms their claim that the first amendment has been violated.

■ It being established that matters of constitutional import should be reached only if no other disabling defect can be discovered in a challenged statute or regu-

**3.** Although plaintiffs have raised some question about the extent to which the President authorized the Attorney General to promulgate 8 C.F.R. § 214.5, it is apparent that its creation was a coordinated action on the part of those executive branch officials having primary responsibility in the area of foreign policy and in the regulation of immigration and naturaliza-

tion. *Compare* Remarks of the President at the Thirteenth Constitutional Convention of the AFL–CIO, 15 Weekly Comp. of Pres. Doc. 2120, 2121–22 (Nov. 15, 1979) *and* Announcement on Action To Be Taken by the Department of Justice, 15 Weekly Comp. of Pres. Doc. 2107, 2107 (Nov. 10, 1979) *with* 8 C.F.R. § 214.5, *reprinted in* 44 Fed.Reg. 65,727 (1979).

lation, we must consider initially plaintiffs' assertions regarding the supposed nonconstitutional grounds for section 214.5's invalidity.

■ The first of these is their charge that the rule should be declared void because the Attorney General has not complied with the "notice and comment" provisions of the Administrative Procedure Act (APA), 5 U.S.C. § 553(b)(B), which require that notice of a proposed regulation and time for comment on its contents be afforded the public unless there is an agency finding that good cause exists for waiver of the requirement because such a procedure would be "impracticable, unnecessary, or contrary to the public interest." To justify the waiver of notice and comment on the basis that it would be "impracticable, unnecessary, or contrary to the public interest," the instant regulation states that it was "issued in the course of, and in response to, the international crisis created by the unlawful detention of American citizens in Tehran." Nevertheless, plaintiffs argue that the Court should find the waiver improper since defendants' general invocation of the Iranian crisis does not explain precisely why it is impracticable or contrary to the public interest to comply with the notice and comment requirement.

Defendants counter that these regulations were the result of rulemaking involving a "foreign affairs function of the United States" and thus are exempt from the notice and comment requirements under section 553(a)(1) of title 5 and that the reasons given in the regulation are sufficient to support its exemption from the provisions for notice and comment. As to the former argument, although a foreign event may have provoked the promulgation of section 214.5, this in and of itself cannot exempt it from the Administrative Procedure Act, especially in light of the recognized application of the APA to deportation proceedings, *Wong Yang Sung v. McGrath*, 339 U.S. 33, 51, 70 S.Ct. 445, 94 L.Ed. 616 (1950). While the Supreme Court's ruling in that instance subsequently was legislatively overruled, Supplemental Appropria-

tions Act of 1951, Pub.L. No. 81-843, 64 Stat. 1048, there was no indication by Congress that its action was motivated by any intent to reassert a foreign affairs exemption. *Hou Ching Chow v. Attorney General*, 362 F.Supp. 1288, 1290 & n.7 (D.D.C. 1973). The validity of the theory of *Wong Yang Sung* therefore endures and will not allow the executive to invoke the foreign affairs exemption to control a matter that essentially involves naturalization and deportation. *Id.* at 1290.

■ Turning then to an examination of the rationale given in the regulation itself for its exemption from the notice and comment requirement, while the reasons expressed are perhaps not as explicit as they might have been, they nonetheless are sufficiently set forth to demonstrate that good cause for a waiver existed. Assuming for the moment that the regulation at issue is valid, certainly any delay in its promulgation and effective date would proportionately weaken any effect it might have upon the grave crisis that triggered its creation, thereby rendering the notice and comment requirement impracticable and contrary to the public interest. *See DeRieux v. Five Smiths, Inc.*, 499 F.2d 1321, 1332 (Temp. Emer.Ct.App.), *cert. denied*, 419 U.S. 896, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974). Defendants' waiver of notice and comment was not in violation of section 553(b)(B).

■ Plaintiffs also challenge the validity of certain specific provisions of section 214.-5, to wit, its requirement that when reporting, Iranian students must bring their passport and Form I-94 alien registration statement, evidence of enrollment from their school, a letter from school officials showing they are maintaining the proper number of credit hours, and evidence of current address, 8 C.F.R. § 214.5(a)(1)–(5), as well as its statement that failure to appear will constitute a violation of the conditions of the students' stay, subjecting them to deportation proceedings. Putting aside the constitutional issues involved in the enforcement of section 214.5, the Court finds its requirements and conditions to be proper as within the latitude given the executive

under section 1184(a) "to insure that . . . upon failure to maintain status under which he was admitted . . . such alien will depart from the United States." The various documents the students are required to bring obviously are relevant to the question of whether they are maintaining their status and, therefore, within the intent of Congress in this regard. The noncriminal, regulatory nature of immigration proceedings likely precludes any assertion that a constitutional violation might be thought to arise because of the compulsory production of the documents in question. *See United States v. Campos-Serrano*, 430 F.2d 173, 176 (7th Cir. 1970), *aff'd on other grounds*, 404 U.S. 293, 92 S.Ct. 471, 30 L.Ed.2d 457 (1971). Similarly, the requirement that failure to report will be considered a violation of status comes within the Attorney General's power to insure that nonimmigrant aliens who are out of status will leave this country. While it is quite unlikely, in light of the proalien, antideportation policy of Congress as recognized by the federal courts, that an inadvertent failure to appear would be held to be sufficient grounds for deportation, *see Mashi v. INS*, 585 F.2d 1309,

1315–17 & n.15 (5th Cir. 1978), the need to insure that those called will indeed respond obviously effectuates the congressional purpose inherent in section 1184(a).[4]

Their nonconstitutional arguments failing, plaintiffs next rely on the due process clause of the fifth amendment, asserting that the regulation in question is unconstitutional because it constitutes a violation of that amendment's guarantee of equal protection of the laws. By focusing only upon those nonimmigrant students who are citizens of the Islamic Republic of Iran, plaintiffs contend, the defendants have promulgated a regulation the effectiveness of which is dependent on the individual's national origin, an impermissible basis for such a rule.

■ Plaintiffs are quite correct in their assertions that the classification in this instance is one founded upon national origin and that the constitutional guarantee of equal protection can be evoked in most circumstances to protect against the government's invocation of such a standard, even in its dealings with aliens. *See Yick*

**4.** Plaintiffs have also raised questions about certain Immigration and Naturalization Service administrative practices under the regulation. In particular, they challenge the practice of photographing those students who appear pursuant to the regulation and further protest against the alleged "chill" that certain directives of the President and the Attorney General have placed upon the usual willingness of INS officials to exercise their discretion to excuse certain minor violations of the conditions of the nonimmigrant students or to take alternative actions that would not result in deportation. As to the former, while section 1301 of title 8 provides for the fingerprinting of all aliens who enter the country, there appears to be no explicit authority allowing them to be photographed. On the other hand, as it was represented to the Court by plaintiffs at the oral hearing in this matter, the students' passports, which they properly are required to produce as the Court has noted, *see* pp. 1137–1138 *supra*, already contain their photographs. Although the government's procedure thus seems somewhat duplicative, it is not unreasonable to assure identification and, accordingly, there is no basis to deny the government the opportunity to retake a photograph that can be required to be produced anyway. Regarding the matter of INS discretionary relief, while denying that they

are seeking ι to mandamus INS officials to perform a discretionary function, which they cannot do, *see, e. g., Knable v. Wilson*, 187 U.S.App.D.C. 48, 51 & nn.9–10, 570 F.2d 957, 960 & nn.9–10 (1977) (citing authorities), plaintiffs nonetheless assert that an injunction will lie to prevent the Attorney General and the INS from denying students this relief. As support for this proposition, plaintiffs rely on *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), in which the Supreme Court dealt with the issue whether the Attorney General could influence the discretion in ruling on deportations that he had afforded by regulation to the Board of Immigration Appeals. Since the Attorney General had transferred all discretion in the matter to another body, he could not thereafter seek to influence or otherwise exercise that discretion, *id.* at 266–67, 74 S.Ct. 499; however, a failure to exercise the discretion afforded the board had to be shown, *id.* at 268, 74 S.Ct. 499. It is thus apparent that if it is indeed accurate that the Attorney General has sought improperly to influence discretion afforded solely to INS officials (there is no evidence whatsoever of this allegation at this time) relief can only be granted on a case by case basis, at which time the discretion, or lack thereof, exercised by immigration officials can be examined fully.

*Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Further, it has been long acknowledged that distinctions based on ancestry or national origin are "odious to a free people whose institutions are founded upon the doctrine of equality," *Hirabayashi v. United States,* 320 U.S. 81, 100, 63 S.Ct. 1375, 1385, 87 L.Ed. 1774 (1943); *accord, e. g., Oyama v. California,* 332 U.S. 633, 644–46, 68 S.Ct. 269, 92 L.Ed. 249 (1948); *Korematsu v. United States,* 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194 (1944), and will be cause to signal the type of strict judicial scrutiny afforded a "suspect" classification in order to determine whether it is proper as based upon a compelling governmental interest.[5]

Acknowledging these established principles of constitutional law, defendants nonetheless seek to avoid their application by asserting that they simply are not relevant in this instance. In support of this theory, they point to what they claim is equally well-established precedent regarding the entitlement of the Congress and the executive to deal with the immigration and naturalization of aliens.

The power of Congress over naturalization and immigration arises from clause 4 of section 8 of article 1 of the Constitution, which provides for congressional authority "[t]o establish an uniform Rule of Naturalization . . . ." The United States Supreme Court has recognized that "as firmly imbedded in the legislative and judicial tissues of the body politic as any aspect of our government" is the principle that responsibility for the formulation of "policies pertaining to the entry of aliens and their right to remain here . . . is entrusted exclusively to Congress." *Galvan v. Press,*

347 U.S. 522, 531, 74 S.Ct. 737, 743, 98 L.Ed. 911 (1954). It is not surprising then that the Supreme Court has also declared that "over no conceivable subject is the legislative power of Congress more complete than it is over" the immigration and naturalization of aliens. *Oceanic Stream Navigation Co. v. Stranahan,* 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909); *accord, e. g., Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977); *Kleindienst v. Mandel,* 408 U.S. 753, 766, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). Congressional power to act in such matters is so broad as to entitle Congress to "make rules that would be unacceptable if applied to citizens." *Mathews v. Diaz,* 426 U.S. 67, 80, 96 S.Ct. 1883, 1891, 48 L.Ed.2d 478 (1976).

In its role as policy maker, Congress is aided by various executive branch officials, most particularly the Attorney · General, who have the responsibility for insuring that the statutory policies of Congress concerning immigration are implemented and enforced. In analyzing the scope of the power of the two branches, as well as the relationship between them, in matters dealing with immigration and naturalization, Justice Gray nearly one hundred years ago stated:

The power to exclude or to expel aliens, being a power affecting international relations, is vested in the political departments of the government, and is to be regulated by treaty or by act of congress, and to be executed by the executive authority according to the regulations so established, except so far as the judicial department has been authorized by treaty or by statute, or is required by the para-

5. Besides the guarantee of equal protection of the laws, aliens lawfully admitted to this country are entitled to a panoply of substantive and procedural rights under the Constitution. In criminal proceedings, aliens enjoy the protection of the fourth, fifth, sixth amendments, and very likely the eighth amendment as well. 1 C. Antieau, *Modern Constitutional Law* § 9:25, at 718–19 (1969). Similarly, in civil proceedings they are entitled to the same procedural protections as citizens, including the right to a jury trial. *Id.* at 719. The first amendment protections of speech, press, religion, assembly, and association also apply to aliens here in this country, as do the freedom to contract, freedom of enterprise, and the right to work. *Id.* § 9:26, at 720. Further, an alien being deported is entitled to procedural due process, including a fair hearing conducted in good faith and preceded by proper notice adequately specifying the grounds for governmental action. *Id.* § 9:29, at 725–26. At the hearing, the alien has the right to be heard, to present witnesses and evidence, and to cross-examine government witnesses. *Id.* at 726.

mount law of the constitution, to intervene.

*Fong Yue Ting v. United States,* 149 U.S. 698, 713, 13 S.Ct. 1016, 1022, 37 L.Ed. 905 (1893). As Justice Gray illuminated, the nature of many of the policy decisions involving immigration and naturalization are based upon foreign policy considerations, and thus have been left to the political departments of the federal government. This, in turn, affords a very narrow scope for judicial review of congressional or executive actions. *See, e. g., Fiallo v. Bell, supra,* 430 U.S. at 796, 97 S.Ct. 1473; *Hampton v. Mow Sun Wong,* 426 U.S. 88, 101 & n.21, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976); *Mathews v. Diaz, supra,* 426 U.S. at 81, 96 S.Ct. 1883.

Drawing upon these established notions, defendants argue that the Court is precluded from conducting a constitutional examination of the regulations in question, except to review whether they are somehow "wholly irrational." This result, they contend, is mandated by the decisions of the Supreme Court which have interpreted the powers of the Congress and the executive in immigra-

tion matters. They fail to consider, however, a fundamental distinction between those decisions and the instant actions. In the other cases, the challenged provision was either a specific statutory enactment of Congress, *Fiallo v. Bell, supra,* 430 U.S. at 788–89, 97 S.Ct. 1473; *Mathews v. Diaz, supra,* 426 U.S. at 69–70, 96 S.Ct. 1883; *Kleindienst v. Mandel, supra,* 408 U.S. at 754–56, 92 S.Ct. 2576; *Galvan v. Press, supra,* 347 U.S. at 529–32, 74 S.Ct. 737; *Harisiades v. Shaughnessy,* 342 U.S. 580, 583–84, 72 S.Ct. 512, 96 L.Ed. 586 (1952), a regulation promulgated directly under the authority of an act of Congress, *United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 540–42, 70 S.Ct. 309, 94 L.Ed. 317 (1950),[6] or a regulation that was promulgated pursuant to authority other than that of the Congress or the executive over immigration and naturalization matters, *Hampton v. Mow Sun Wong, supra,* 426 U.S. at 114–16, 96 S.Ct. 1895. In this instance, while Congress has given the Attorney General broad, general authority to promulgate the regulations for aliens and to establish the conditions for their entry, the later violation of those conditions being deemed sufficient to

**6.** Defendants cite *United States ex rel. Knauff v. Shaughnessy* in support of their position, quoting in part from the following passage:

Petitioner contends that the 1941 Act and the regulations thereunder are void to the extent that they contain unconstitutional delegations of legislative power. But there is no question of inappropriate delegation of legislative power involved here. The exclusion of aliens is a fundamental act of sovereignty. The right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation. When Congress prescribes a procedure concerning the admissibility of aliens it is not dealing alone with a legislative power. It is implementing an inherent executive power.

Thus, the decision to admit or to exclude an alien may be lawfully placed with the President, who may in turn delegate the carrying out of this function to a responsible executive officer of the sovereign, such as the Attorney General. The action of the executive officer under such authority is final and conclusive:

338 U.S. 537, 542–43, 70 S.Ct. 309, 312, 94 L.Ed. 317 (1950) (citations omitted) (4–3 decision). Despite this broad language, the Court was careful to point out that the action of the

Attorney General barring an alien's entry into this country was within the discretion afforded him by a broad congressional enactment dealing with exclusion of aliens. *Id.* at 543–44, 70 S.Ct. 309. In addition, the Court itself noted that this broad executive power was not necessarily the rule with regard to the "deportation of persons who have gained entry into the United States," *id.* at 543, 70 S.Ct. at 312, distinguishing its holding from the circumstances involved in this case. Moreover, to whatever extent *Knauff* might be read to support defendants' position, its application to the present case is questionable in light of the Supreme Court's later decision in *Kent v. Dulles,* 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958), in which the Court refused to allow the Secretary of State, absent congressional authorization, to abrogate a citizen's fundamental right to travel by denying him a passport. *See* pp. 1143–1144 *infra; cf. United States ex rel. Knauff v. Shaughnessy, supra,* 338 U.S. at 551–52, 70 S.Ct. 309 (Jackson, J., with Black & Frankfurter, JJ., dissenting) (statutory authorization for excluding aliens not sufficiently explicit to allow executive official to bar entry of alien wife of American citizen without notice of reasons for exclusion or hearing).

serve as just cause for deportation, 8 U.S.C. §§ 1103(a), 1184(a) (1976), those enactments are drawn neutrally in that they refer to "aliens" without giving the Attorney General explicit authority to discriminate among aliens on the basis of national origin. The obvious question then, is what was the congressional intent in this regard?

Certainly, the established canons of statutory interpretation applied to the immigration and deportation statutes, which require a strict construction so as not "to trench on [an alien's] freedom beyond that which is required by the narrowest of several possible meanings of the words used," *Fong Haw Tan v. Phelan*, 333 U.S. 6, 10, 68 S.Ct. 374, 376, 92 L.Ed. 433 (1948); *accord, e. g., Mashi v. INS, supra*, 585 F.2d at 1316; *Lennon v. INS*, 527 F.2d 187, 193 (2d Cir. 1975), do not support the conclusion that defendants' discriminatory regulations are authorized by an express or implied congressional intent to allow deportation proceedings to be instituted on the basis of a national origin classification. Indeed, in numerous other enactments Congress has indicated its disdain for discrimination based on national origin. *See, e. g.,* 42 U.S.C. § 2000a (1976) (public accommodations); *id.* § 2000b (public facilities); *id.* § 2000c–6 (public education); *id.* § 2000d (federally assisted programs); *id.* § 2000e–2 (employment). See also 42 U.S.C. §§ 1983, 1985 (1976). Further, throughout the statutory scheme governing immigration and naturalization, Congress has been very explicit in those instances when it desired that a particular group of aliens be treated in a manner different from others. *See, e. g.,* 8 U.S.C. §§ 1101(b)(5), 1153(a)(7), 1253(g) (1976); 8 U.S.C.A. § 1182(a)(33) (West Cum.Supp. 1979). We, therefore, find no statutory basis for the discriminatory classification established by the regulation such that defendants could cloak their rule's discriminatory effect in the mantle of congressional approval under its power over immigration and naturalization and thereby for practical purposes, exempt the regulation from judicial scrutiny.[7]

Such a decision does not end the matter, however, for defendants have asserted that the inherent duty of the executive arising under section 4 of article II, to act in those matters involving this country's relations with the international community gives them authority concurrent with that of the Congress to act in the sphere of immigration and naturalization, likewise removing their actions in this instance from constitutional scrutiny by the Court.[8] The very nature of foreign affairs, they argue, involving as it does the shifting thrusts of diplomatic relations and the concomitant need for flexibility and rapid action, gives the executive the power to promulgate and apply this regulation only to Iranian students despite the fact that Congress has not authorized such discrimination in the creation and implementation of deportation procedures. The clear import of the defendants' argument is that, even without the approval of Congress, it nonetheless is

---

7. We note that Congress has not been totally silent on the subject of the President's duty to free any American citizen unjustly imprisoned overseas, for it has declared that "the President shall forthwith demand the release of such citizen, and if the release so demanded is unreasonably delayed or refused, the President shall use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release . . . ." 22 U.S.C. § 1732 (1976). While the defendants have made a passing reference to this enactment, they do not rely upon it as a congressional endorsement of their actions, apparently believing, as does the Court, that while it may give the President some extra latitude to deal militarily or economically with a foreign nation holding American citizens, it does not act to authorize the Chief Executive to abrogate individual rights guaranteed by the Constitution.

8. While defendants also make reference to the general grant of executive power, U.S.Const. art. II, § 1, cl. 1, and to the executive's constitutional duty to faithfully execute the laws, *id.* § 3, cl. 1, these powers, at least in this instance, add little to the authority of the executive in matters of foreign affairs, which is the cornerstone of executive authority in this case. Moreover, it should be added that while the President has declared that a national emergency exists, Exec. Order No. 12170, 44 Fed.Reg. 65,729 (1979), defendants have not attempted to claim that their actions were taken on the basis of the executive's war powers, *see* U.S. Const. art. II, § 2, cl. 1.

the constitutionally delegated prerogative of the executive to act in this situation.

The question of the proper delegation of congressional and executive power has been debated for years and analyzed for decades, the paramount decision being *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). In the absence of congressional authorization, Justice Black, on behalf of the majority, held that the President did not have authority pursuant to his powers as the Chief Executive or the Commander in Chief to seize the nation's steel mills and prevent a strike that would have halted the production of steel vital to the successful prosecution of the Korean War. In a concurring opinion Justice Jackson set forth an exposition of the relationship of congressional and executive power that defines well the parameters for analysis of the delegation problem now before the Court.

> The actual art of governing under our Constitution does not and cannot conform to judicial definitions of the power of any of its branches based on isolated clauses or even single Articles torn from context. While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity. Presidential powers are not fixed but fluctuate, depending upon their disjunction or conjunction with those of Congress. We may well begin by a somewhat over-simplified grouping of practical situations in which a President may doubt, or others may challenge, his powers, and by distinguishing roughly the legal consequences of this factor of relativity.
>
> 1. When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate. In these circumstances, and in these only, may he be said (for what it may be worth), to personify the federal sovereignty. If his act is held unconstitutional under these circumstances, it usually means that the Federal Government as an undivided whole lacks power. A seizure executed by the President pursuant to an Act of Congress would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.
>
> 2. When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain. Therefore, congressional inertia, indifference or quiescence may sometimes, at least as a practical matter, enable, if not invite, measures on independent presidential responsibility. In this area, any actual test of power is likely to depend on the imperatives of events and contemporary imponderables rather than on abstract theories of law.
>
> 3. When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive Presidential control in such a case only by disabling the Congress from acting upon the subject. Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system.

*Id.* at 635–38, 72 S.Ct. at 870–871 (footnotes omitted).

Relating these principles to the instant case, it is evident that there has not been what could be quantified as an express or implied Congressional authorization or denunciation of executive actions like those taken by the defendants here. While it is apparent that Congress has primary responsibility in the regulation of immigration, the executive, by reason of the foreign af-

fairs implications of any decision or action affecting aliens, is not without authority in this area. *See Hampton v. Mow Sun Wong, supra,* 426 U.S. at 101 & n.21, 96 S.Ct. 1895; *Mathews v. Diaz, supra,* 426 U.S. at 81–82, 96 S.Ct. 1883. Accordingly, Justice Jackson's "zone of twilight" must be the focus of the Court's consideration, where "any actual test of power is likely to depend on the imperatives of events and contemporary imponderables rather than on abstract theories of law." *Youngstown Sheet & Tube Co. v. Sawyer, supra,* 343 U.S. at 637, 72 S.Ct. at 871 (footnote omitted).

The "imperative of events and contemporary imponderables," as well as certain constitutional precepts, lend more than a modicum of support to defendants' assertions of authority. The present crisis in Iran sorely tests the executive's ability to firmly demonstrate this country's willingness to resist this form of international blackmail while, at the same time, acting in a manner that fully reflects the fundamental American belief in individual liberties applied evenly, dispassionately, and justly, with equal treatment for all persons, whether they agree or disagree with the aims of those holding the innocent American citizens in Tehran. The very nature of the executive and its power to conduct foreign affairs places that branch of government and its officials at the forefront where it must bear the brunt of the awesome responsibility for protecting our national interest in seeing that the inviolability of this nation's diplomatic missions is respected, yet simultaneously protecting the rights of each individual, including those who do not seek to further that ideal. This then is the dichotomy of foreign affairs which has caused the Supreme Court to observe that "[a]ny rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with the greatest caution." *Mathews v. Diaz, supra,* 426 U.S. at 81, 96 S.Ct. at 1892.

■ But, above all, it is patent that the executive, even in the area of immigration and naturalization, must be subject to applicable principles of the Constitution. *See Galvan v. Press, supra,* 347 U.S. at 531, 74 S.Ct. 737; *Fong Yue Ting v. United States, supra,* 149 U.S. at 713, 13 S.Ct. 1016.

To allow the executive to, in effect, delegate to itself the power to abrogate the important, constitutionally protected right to equal protection of the laws under the statutes governing immigration when Congress, which has primary responsibility for the policy decisions in immigration matters, has not acted, exceeds the proper boundaries within which the three branches of our constitutional government co-exist.

In resolving this conflict between the need for executive expediency and the ideal of individual liberty, we consider the analogous situation in *Kent v. Dulles,* 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958). In *Kent,* the issue was whether the Secretary of State, acting pursuant to a broadly worded congressional enactment bestowing upon him the authority to issue passports, had the power to curtail the right of a citizen to travel by issuing and enforcing a regulation denying passports, which were necessary to leave the country, to alleged Communists or those refusing to submit an affidavit denying membership in the Communist party. Despite the general language of the congressional enactment that was the basis of the Secretary's regulation, the Court found that when Congress passed the provision, it merely intended to adopt the existing administrative practice under which the Secretary had denied passports only for failure to show allegiance to the United States or upon proof of participation in criminal activity. 357 U.S. at 127, 78 S.Ct. 1113. While recognizing that the foreign affairs power of the executive was implicated in the issuance of a passport in that such a document extended some diplomatic protection to the bearer, in light of the impact upon the individual's fundamental right to travel were it withheld, the Court refused to accept that executive power as a valid basis upon which the Secretary could rest his authority to promulgate the regulations, stating that "[i]f that 'liberty [to travel]' is to be regulated, it must be

pursuant to the lawmaking functions of the Congress." *Id.* at 129, 78 S.Ct. at 1120.

As in *Kent*, the right here involved—the guarantee of equal protection of the laws implicit in the due process clause of the fifth amendment—is one fundamental to the individual freedom of all persons, citizens and aliens alike, and it is one that the action of the executive threatens to totally annul. The effect of the regulation at issue is to establish two classes of nonimmigrant students, Iranians and non-Iranians, each of which is to be subjected to a different type of executive action. This classification, based as it is on national origin, would, under the usual equal protection analysis, merit strict judicial scrutiny to determine whether it is supported by a compelling governmental interest. Recently, however, in *Hampton v. Mow Sun Wong, supra,* 426 U.S. at 100, 96 S.Ct. at 1904, the Supreme Court declared that in instances when the guarantee of equal protection under the due process clause of the fifth amendment is invoked against a federal enactment or regulation, a different analysis may be required in that "there may be overriding national interests which justify selective federal legislation that would be unacceptable for an individual State." In further explaining the appropriate standard to be applied in such circumstances, the Court stated that "[w]hen the Federal Government asserts an overriding national interest as justification for a discriminatory rule which would violate the Equal Protection Clause if adopted by a State, due process requires that there be a legitimate basis for presuming that the rule was actually intended to serve that interest." *Id.* at 103, 96 S.Ct. at 1905. Defendants here allude to three interests that might qualify as "overriding national interests" justifying their discriminatory regulation: 1) the protection of the lives of the hostages held in Iran by quelling potential domestic violence; 2) the need to express to the government in Iran this country's displeasure with events in Tehran; 3) the need to identify Iranian students to assist in the development of appropriate responses to the crisis in Iran.

Of these three interests only the former, the protection of the hostages, even deserves consideration for the label "overriding." The need to express American anger at Iranian actions is hardly sufficiently compelling to justify subjecting only Iranian students to a discriminatory thirty-day roundup that violates the fundamental principles of American fairness, especially since numerous other retaliatory actions, political, economic and otherwise, can be invoked to accomplish the same purpose without disrupting the lives of so many who come to this country merely to receive an education with which they could better themselves and their native land. So too, the census taking interest asserted, being one of administrative convenience, cannot be called "overriding." Moreover, even as to the highest priority national interest in protecting the hostages, which all of us share, the reasons advanced for the government's discriminatory actions make it clear they do not serve that interest, there being at best a dubious relationship between the presence of Iranian students in this country, whether legally or otherwise, and the safety and freedom of the hostages. According to the defendants, the possibility that Americans may commit acts of violence against Iranians in this country, which, in turn, may cause a hostile counterreaction in Iran, justifies this regulation. If the government's fear in this regard is based on the possibility that Iranian students, through demonstrations or otherwise, will provoke Americans into action, then this regulation fails to address that concern unless it is true that only those Iranian students who are here illegally and can be deported are likely to commit such acts (or the purpose of the regulation is somehow to prohibit free speech, which raises constitutional questions). On the other hand, if the government's fear is that by their very presence Iranian students will provoke violence, then again this regulation does not address the problem, for it is designed only to identify and expel those who are here illegally, all others being free to remain as targets of violence. This leaves only a psychological purpose for the regulation, its intent being

one of assuaging the anger of the American people by demonstrating that something is being done in the face of crisis. Yet, this undeniably tenuous cause and effect relationship between this inherently discriminatory regulation and the unpredictable emotional reaction it is to temper, based as it must be on speculation, utterly fails to demonstrate that the regulation indeed serves the national interest in protecting the hostages. *Cf. Jackalone v. Andrus,* No. 79–3140 (D.C. Cir. Nov. 19, 1979). In essence, although defendants' regulation is an understandable effort designed to somehow reply to the Iranian attack upon this nation's sovereignty and the seizure of its citizens, it is one that does not support a legitimate national interest and therefore would not excuse the wholesale nullification of the rights of the students involved or save 8 C.F.R. § 214.5 from violating the equal protection guarantee of the fifth amendment.[9]

In juxtaposition to the regulation's violation of plaintiffs' constitutional right to equal protection of the laws is the asserted power of the executive to act in the area of immigration and naturalization under its constitutional authority to conduct foreign policy. In invoking this prerogative, defendants seek to draw upon a reservoir of executive power that is necessarily of great depth, being based as it is upon the need for executive freedom of action as it performs the complex and delicate task of directing this country's relations with other members of the international community. *See Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.,* 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948); *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 319–21, 57 S.Ct. 216, 81 L.Ed. 255 (1936). The crisis now facing the nation well illustrates the need for the wide degree of latitude afforded the executive in foreign relations.

In balancing the obviously weighty considerations involved in this case—the Constitution's abhorrence of discrimination based on national origin, the need to protect against improper assertions of executive power in those areas where the Constitution has placed with the elected representatives of the Congress the primary responsibility for action, and the executive's need for freedom of action in international affairs—we can only conclude that if the violation of equal protection inherent in the regulation at issue here is to be countenanced, "it must be pursuant to the lawmaking functions of the Congress." *Kent v. Dulles, supra,* 357 U.S. at 129, 78 S.Ct. at 1120.

While the intrusion upon the individual liberty of these aliens in this instance might have seemed at first blinking wholly justified in terms of the result sought, to allow its destruction of our fundamental tenets would throw open the door to further broad and potentially dangerous assertions of executive power over aliens, exclusive of the protections the Constitution provides. Today there are few major occurrences, domestic or otherwise, without significant international impact. There are many opportunities for the executive to invoke its authority to conduct foreign policy and thereby delegate to itself the authority to, in effect, assume the role of Congress, the elected, representative body with which the primary responsibility for immigration policy making rests, and thus assure that its actions will be afforded that immunity from judicial review that courts have recognized accrues to legislative efforts in that field. Accordingly, the promulgation of 8 C.F.R. § 214.5 being an act lying outside of the bounds of the authority conferred on the defendants by the Congress and the Constitution, that regulation is determined to be unconstitutional.

■ Having established the unconstitutionality of 8 C.F.R. § 214.5, we now consider the question of the proper remedy to

---

**9.** Likewise, if traditional equal protection analysis were applied in this instance, the same reasons that demonstrate the government's failure to justify its actions as based on an "overriding national interest" would show that the interests asserted are not sufficiently compelling to meet the standard of strict scrutiny required in examining classifications based on national origin.

be afforded to those who are affected by its terms. An order will be entered this date permanently enjoining defendants from further enforcement of 8 C.F.R. § 214.5, thereby relieving all those Iranian students in the class represented by plaintiffs who have not yet reported to INS pursuant to section 214.5 from the need to do so. There remains, however, the matter of the relief to be accorded to those students who have already complied with what has now been determined to be an unconstitutional regulation. To remedy any injury they may have suffered the Court will also permanently enjoin the defendants from continuing any present deportation proceedings instituted against students as a result of their compliance with section 214.5 and from using any information, written, oral, or photographic, gathered from those Iranian students who have reported to the Immigration and Naturalization Service pursuant to section 214.5 in any administrative function or in any proceeding under the immigration laws which, as a result of that information, would result in deportation or otherwise penalize the student concerned. While somewhat akin to the rule of exclusion under the fourth amendment, this injunctive ban on the use of the information gathered under the regulation obviously is not intended to forever preclude the institution of proceedings against any member of the class of Iranian students who are the subject of this litigation.

If the Congress, acting within the Constitution, should hereafter enact a statute designed to allow the immigration authorities to check the status of these nonimmigrant students and, in the course of enforcing that enactment, information identical to that which has been gathered under section 214.5 is requested or revealed, so long as the original information discovered under section 214.5 was not in any way involved in the institution or prosecution of the new enforcement proceeding, the newly garnered but identical information could be used. It should be added that the injunctive relief granted pertains only to information furnished pursuant to section 214.5.

It is emphasized that this injunction in no way precludes the Immigration and Naturalization Service from taking any lawful action against a student when it becomes aware that student, through its own pursuit of truth, is in violation of status, provided that discovery is not based upon information gained pursuant to section 214.5. Accordingly, if a student is illegally in this country and subject under already existing laws to deportation, the INS has the authority to institute deportation proceedings or exercise its discretion, as it appropriately elects, to excuse the more minor transgressions.

The Court's holding today comes in the midst of an extraordinary international crisis. Despite unceasing efforts by the President and his advisors, the release of the hostages thus far has not been effectuated. Although the executive's carefully measured actions as earlier noted are commendable, the question must be asked—how far does the executive power extend? May the President or the Attorney General abridge those rights guaranteed by the Constitution in order to further this country's foreign policy objectives? This Court thinks not. The President himself has made it clear that the crisis, albeit a situation creating far-reaching consequences, does not justify abridgement of those rights guaranteed by the Constitution and laws of this country.

> In this time of trial, our deep concern is for the lives of these brave hostages—our Nation's loyal citizens and faithful representatives. Every American feels anger and outrage at what is happening to them, just as every American feels concern for their safety and pride in their great courage. This crisis calls for firmness and it calls for restraint.

> \*　　\*　　\*　　\*　　\*　　\*

> I've directed our immigration authorities to review the visas of some 50,000 Iranian students, who are guests here in our country. Our Nation is fully committed to the enhancement of human rights, the protection of legal rights, and the enhancement of civil justice. All provisions of the United States Constitution will be

honored. *All foreign nationals who are here lawfully may continue here with their work or studies. But those who are here illegally will be processed promptly and lawfully for deportation back to their own country.*

Remarks of the President at the Thirteenth Constitutional Convention of the AFL–CIO, 15 Weekly Comp. of Pres. Doc. 2120, 2121–22 (Nov. 15, 1979) (emphasis added).

The depth of this emotional, tragic crisis is of such consequence as to generate not only unusual solidarity of our citizens at home but to foster unrelenting unrest. It appears easy to foresake briefly our constitutional beliefs and realities and yield to the moment of time. But consider the result. What if any future international crisis arises of *any* dimension between our great country and another country. Would students, or any other classification of persons, simply because they happened to be present, be singled out, selectively corralled, and required to perform certain actions to develop affirmatively that they individually are blameless despite the action of their government?

To countenance the disparate treatment of Iranian students that this regulation candidly promotes would not only reject the most cherished constitutional precepts applicable to all of us, citizen and alien alike, but would create a precedent of alarming elasticity from which future extreme assertions of executive power could readily springboard.

Constitutional submission to the wash of emotion would eliminate the fair play and equality that is the quintessence of the American way and it is cardinal that the diminishment of the rights of those most vulnerable diminishes in the end the rights of all others.

A finding that section 214.5 is unconstitutional being otherwise compelled, it is unnecessary to reach the issues of its validity under the first and fourth amendments and under international law.

An appropriate Order and Judgment for Permanent Injunction accompanies this memorandum opinion.

## APPENDIX A

### PART 214—NONIMMIGRANT CLASSES

§ 214.5 Requirements for maintenance of status for nonimmigrant students from Iran.

(a) An alien admitted as an F–1 or J–1 nonimmigrant student to attend a post-secondary school, including a vocational school, who is a native or citizen of Iran must report to the INS District Office or suboffice having jurisdiction over his or her school or to an INS representative on campus before December 14, 1979, and provide information as to residence and maintenance of nonimmigrant status. Each student must have in his or her possession at the time of reporting:

(1) Passport and Form I–94;

(2) Evidence from the school of enrollment and payment of fees or waiver of payment of fees for the current semester;

(3) A letter from school authorities attesting to the course hours in which presently enrolled and the fact that the student is in good standing; and

(4) Evidence of current address in the United States. Students must provide such other information as INS may request in order to verify maintenance of status and residence.

(b) Failure by a nonimmigrant student to comply with the provisions of paragraph (a) of this section or willful provision of false information to the INS will be considered a violation of the conditions of the nonimmigrant's stay in the United States and will subject him or her to deportation proceedings under Section 241(a)(9) of the Act.

(c) A condition of the admission and continued stay in the United States of a nonimmigrant covered by paragraph (a) of this section is obedience to all laws of United States jurisdictions which prohibit the commission of crimes of violence and for which a sentence of more than one year imprisonment may be imposed. A nonimmigrant's conviction in a jurisdiction in the United States for a crime of violence for which a

**1148**

sentence of more than one year imprisonment may be imposed, (regardless of whether such sentence is in fact imposed) constitutes a failure to maintain status under Section 241(a)(9) of the Act.

The foregoing actions are taken in accordance with the Presidential directive of November 10, 1979, issued in the course of, and in response to, the international crisis created by the unlawful detention of American citizens in the American Embassy in Tehran. Accordingly, the notice and comment and delayed effective date provisions of Section 553 of Title 5 of the United States Code are hereby waived as impracticable and contrary to the public interest. Effective date. The amendments contained in this order become effective on November 13, 1979.

Dated: November 13, 1979

Benjamin R. Civiletti,

Attorney General of the United States.