**ELECTRONIC DATA SYSTEMS CORPORATION IRAN**

v.

**The SOCIAL SECURITY ORGANIZATION OF the GOVERNMENT OF IRAN et al.**

Civ. A. No. 3–79–218.

United States District Court,
N. D. Texas,
Dallas Division.

Feb. 12, 1981.

Thomas W. Luce, III, Dallas, Tex., Michael Sandler, Washington, D. C., Martha A. Mills, Chicago, Ill., for plaintiff.

D. L. Case, Dallas, Tex., Mark C. Rutzick, Federal Programs Branch, Civil Div., Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION

ROBERT W. PORTER, District Judge.

On January 23rd, 1981, Plaintiff in the above-entitled action, Electronic Data Systems Corporation Iran (hereinafter "EDS"), filed its application for a preliminary injunction in aid of judgment. EDS seeks an order of this Court restraining the Defendant Secretary of the Treasury of the United States and the United States (hereinafter "federal Defendants") from taking any action to "nullify, interfere with, or abrogate the Final Judgment, Orders, or jurisdiction of this Court herein, the attachment of property of Defendant The Government of Iran by EDS, or EDS' right to enforce its legal rights in the United States courts." The Court set the action for a hearing to take place on February 3rd, 1981. On January 30th, 1981, the Court denied the motion of the Secretary and the United States for a continuance, or in the alternative a stay. On February 3rd, 1981, the Court heard evidence and oral argument from counsel representing the federal Defendants and EDS. At the conclusion of oral argument the Court directed the federal Defendants to submit briefing on their position in opposition to EDS's application for a preliminary injunction no later than 5:00 p. m., February 6th, 1981. In addition the Court determined not to adjourn the hearing, but instead to leave the record open in the event that further evidence or oral argument was necessary. The federal Defendants have submitted the briefing ordered by the Court, and the Court is of the opinion that further evidence or oral argument is unnecessary to the disposition of EDS' application. Therefore, the Court rules as follows:

A. The Evidentiary Record and Preliminary Findings of Fact

The evidence before the Court derives from three sources. The first source is the "Stipulations of Fact for Purposes of Hearing on Application for Preliminary Injunction In Aid of Judgment (hereinafter "Stipulations of Fact"). The second source, Defendant's Exhibit Two, is a stipulation entered into between Marine Midland Bank and EDS on January 28, 1981, in Cause No. 79–1711 pending in the United States District Court for the Southern District of New York. The third source of evidence bearing on Plaintiff's application for a preliminary injunction is the affidavit of Thomas W. Luce, III, counsel for EDS (hereinafter "Luce affidavit"). None of the Defendants in this action have objected to the Luce affidavit, or any part therein. Accordingly, the Court makes the following preliminary Findings of Fact and Conclusions of Law with respect to Plaintiff's application for a preliminary injunction in aid of judgment based upon the above discussed evidentiary submissions and the arguments and pleadings of counsel for all parties. Said Findings of Fact and Conclusions of Law are made only for purposes of a determination as to Plaintiff's application for a preliminary judgment and do not represent final Findings of Fact and Conclusions of Law with respect to this proceeding.

B. Preliminary Findings of Fact

1. Defendant Donald T. Regan is the Secretary of the Treasury of the United States and is sued in his official capacity and not personally.

2. EDS filed this action, pursuant to the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602 et seq., against Defendants The Social Security Organization of the Government of Iran, The Ministry of Health and Welfare of the Government of Iran, and The Government of Iran (hereinafter collectively referred to as the "Iranian Defendants") on February 23, 1979.

3. This action was originally scheduled by this Court for trial on August 20, 1979, but at the Iranian Defendants' insistence, the trial date was continued.

4. This action was tried to the Court without a jury from January 14, 1980, through January 28, 1980. The Iranian Defendants were represented at trial by able and competent Dallas counsel and brought witnesses from Iran to testify on their behalf.

5. On May 2, 1980, this Court entered its Findings of Fact and Conclusions of Law with respect to such action and based thereon the Court on May 9, 1980, entered its Final Judgment in favor of EDS and against the Iranian Defendants in the sum of $19,069,530.00, plus post-judgment interest and costs, and granted to EDS declaratory relief pursuant to 28 U.S.C. § 2201.

6. The Iranian Defendants' Motions for Stay of Enforcement of said Final Judgment were denied by the United States District Court for the Northern District of Texas on June 18, 1980, and by the United States Court of Appeals for the Fifth Circuit on July 7, 1980, and no supersedeas bond or stay of enforcement is in effect with respect to said Final Judgment.

7. Said Final Judgment is now effective and enforceable.

8. The Iranian Defendants have appealed from this Court's award to EDS of monetary relief to the United States Court of Appeals for the Fifth Circuit, No. 80–1641; no date for oral argument for said appeal has been set.

9. Said Final Judgment is wholly unsatisfied in a sum now exceeding $20 million.

10. On April 2, 1979, after EDS had learned of apparent attempts to conceal from it certain assets of Defendant The Government of Iran, EDS filed an action against the Iranian Defendants in the United States District Court for the Southern District of New York. EDS requested therein a prejudgment attachment of certain funds at Marine Midland Bank in New York, New York, to secure satisfaction of the judgment then being sought by EDS against said Defendants.

11. On June 13, 1979, the order of the United States District Court for the Southern District of New York was entered granting EDS' application and directing that funds being held by Marine Midland Bank be levied upon and taken into custody of the United States Marshal for the Southern District of New York.

12. Pursuant to that Order, the Marshal, on July 3, 1979, took such funds into his custody and, as required by the Order, then deposited them in a thirty-day time account at Marine Midland Bank in his own name as custodian for the Court. As of the date of this hearing, these funds remained in such account.

13. On November 14, 1979, the President of the United States in Executive Order 12170 declared a national emergency as a result, inter alia, of the seizure of the United States Embassy and American diplomatic and other personnel in Iran on November 4, 1979. Said Executive Order resulted in the blocking of certain property of The Government of Iran subject to the jurisdiction of the United States. No previous national emergency had been declared in 1978 or 1979 as a result of or in connection with any events in Iran.

14. On November 15, 1979, the Acting Assistant Attorney General of the United States transmitted a letter to the Clerk of the United States Court of Appeals for the Second Circuit. In said letter, the United States stated that Executive Order 12170, and its implementing regulations, did not affect the validity of EDS' preexisting attachment, or nullify or void the same.

15. The Order of Attachment was then on appeal to the United States Court of Appeals for the Second Circuit. That Court on November 28, 1979, remanded the matter to the United States District Court for the Southern District of New York, *Electronic Data Systems Corporation Iran v. Social Security Organization of the Government of Iran*, 610 F.2d 94 (2d Cir. 1979), and that Order remains in full force and effect.

16. On January 19, 1981, the United States and Iran entered into certain understandings expressed in two declarations relative to the hostages and to certain Iranian assets.

17. The text of the basic document, the Declaration of the Government of the Democratic and Popular Republic of Algeria (the "Declaration"), is set forth in Exhibit C of the Luce affidavit and Exhibit E of the Stipulations of Fact.

18. The text of a separate declaration, entitled Declaration of the Government of

the Democratic and Popular Government of Algeria concerning the Settlement of Claims by the Government of the United States of America and the Government of the Islamic Republic of Iran (the "Claims Declaration") is set forth in Exhibit C of the Luce affidavit and Exhibit E of the Stipulations of Fact.

19. On January 19, 1981, Jimmy Carter, while President of the United States, signed Executive Orders 12277 through 12281 (the "Executive Orders"). Under the Declaration, the action provided for in said Executive Orders was not to take effect until certification by the Government of Algeria that the 52 United States hostages had safely departed from Iran. Said event did not occur during the Presidency of Jimmy Carter. On January 20, 1981, Ronald Reagan assumed the office of President of the United States of America, and shortly thereafter at approximately 12:35 p. m., Eastern Standard Time, American diplomatic and other personnel were released from captivity in Iran. The Executive Orders were first filed at the office of the Federal Register on January 22, 1981, and first published in the Federal Register on January 23, 1981. The Executive Orders have never been signed by Ronald Reagan, President of the United States.

20. Executive Order 12279, dated January 19, 1981, is the sole Executive Order dealing with attachments of Iranian funds held by domestic banks, and, by its terms, is effective immediately. The text of Executive Order 12279 is set forth in Exhibit E to the Luce affidavit and Exhibit F to the Stipulations of Fact.

21. On or about January 20, 1981, President Jimmy Carter directed the Federal Reserve Bank of New York to transfer from the United States approximately $2.5 billion in funds which then were subject to attachments and other orders of United States courts prohibiting any such transfer. No prior notice of such action was given to any such court. Pursuant to the direction of the President, the Federal Reserve Bank of New York carried out the transfer. On January 21, 1981, the United States filed a Statement of Interest, in the action brought by EDS against the Iranian Defendants in the United States District Court for the Southern District of New York. In this Statement of Interest, representatives of the Executive Branch asserted the legality of such action despite the admitted failure to notify such courts or seek vacation of applicable attachments or other court orders. The Statement of Interest stated that the declarations would require further implementation through Treasury regulations and further Executive Orders and that the Declarations and such implementing actions would substantially affect attachments of Iranian assets and claims against the Government of Iran. The Government requested that the Court stay proceedings therein to allow, *inter alia*, all further actions necessary for implementation of the Declarations and stated that, on or prior to February 25, the Government would file a statement describing, *inter alia*, the Executive Branch actions and implementing regulations.

22. Under the understandings of the United States as reflected in the Declarations, it was recognized that transfers, even of funds subject to such understandings (other than those already transferred prior to the release of the hostages), were not required to take place for more than six months after the date of such understandings.

23. Counsel for EDS in the New York action and counsel for Marine Midland Bank have entered into a Stipulation providing, *inter alia*, that Marine Midland Bank will not transfer the funds deposited by the United States Marshal, as custodian for the United States District Court for the Southern District of New York, without reasonable notice to EDS.

24. Immediate and irreparable injury, loss or damage will result to EDS from any implementing actions affecting the jurisdiction of this Court, the judgment entered by this Court, EDS' constitutional rights, the attachment secured in the United States District Court for the Southern District of New York and the funds relating thereto, and from the transfer by Marine Midland Bank in purported compliance with Execu-

tive Order 12279, issued January 22, 1981, of funds in custody of the United States Marshal for the Southern District of New York, deposited by said Marshal with said bank pursuant to the Order of Attachment, or by other action by Marine Midland Bank affecting the status of such funds.

C. Standard Of Review.

It is well established in the Fifth Circuit that a preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant has clearly carried the burden of showing that the requisite four criteria are met. *Canal Authority of State of Florida v. Calloway*, 489 F.2d 567 (5th Cir. 1974). The four factors that must be met before a court will grant a preliminary injunction are (1) irreparable harm to the plaintiff from failure to issue the injunction, (2) the relative lack of harm to the defendant from issuance of the injunction, (3) the public interest, and (4) the probability that the plaintiff will ultimately succeed on the merits. *Camenisch v. University of Texas*, 616 F.2d 127, 130 (5th Cir. 1980); *Canal Authority, supra* at 572. Moreover, the movant must clearly carry the burden of persuasion before the drastic remedy will be granted. *Canal Authority, supra* at 573. It is also the settled law of this circuit that the grant or denial of a preliminary injunction rests in the discretion of the trial court. *Shamloo v. Mississippi State Board of Trustees of Institutions of Higher Learning*, 620 F.2d 516, 525 (5th Cir. 1980). The federal Defendants urge that *Adams v. Vance*, 570 F.2d 950, 954–55 (D.D.C.1977), requires an extraordinarily strong showing by the plaintiff in this action, asserting that any injunctive relief would deeply intrude into the core concerns of the executive branch. In *Adams*, the injunctive relief at issue was a temporary restraining order in the nature of a mandatory injunction. The trial court had entered a temporary restraining order requiring the Secretary of State to file an objection with the International Whaling Convention prior to the expiration of the deadline for objecting. Noting that the order "commanded an unprecedented action irreversibly altering the delicate diplomatic balance in the environmental arena" and it

directed "actions so potent with consequences so irretrievable" that the court treated the order as a mandatory injunction as opposed to a temporary restraining order for purposes of determining a right to appeal. The *Adams* court also stated that "when requested immediate injunctive relief deeply intrudes into the core concerns of the executive branch, a court is 'quite wrong in routinely applying to this case the traditional standards governing more orthodox stays'". The case cited by the *Adams* court in support of the proposition is *Sampson v. Murray*, 415 U.S. 61, 83–84, 94 S.Ct. 937, 949–950, 39 L.Ed.2d 166 (1974). Having reviewed that case, the Court is of the opinion that it is simply inapplicable. The Court is also of the opinion that the Fifth Circuit jurisprudence with regard to the issuance of preliminary injunctions, noted above, sets forth the proper standards by which this Court should rule upon Plaintiff's application. The impact of an injunction on the "core concerns of the executive branch" is adequately dealt with by factor number three, above, the public interest.

1. Irreparable Harm to the Plaintiff From Failure to Issue the Injunction.

EDS' fears of irreparable harm arise mainly out of the promulgation and publication of Executive Order 12279. Section 1–101 of that order states in pertinent part:

> 1–101. Any branch or office of a banking institution subject to the jurisdiction of the United States, which branch or office is located within the United States and is, on the effective date, either (a) in possession of funds or securities legally or beneficially owned by the Government of Iran or its agencies, instrumentalities, or controlled entities, or (b) carrying on its books deposits standing to the credit of or beneficially owned by such Government, agencies, instrumentalities, or controlled entities is licensed, authorized, directed and compelled to transfer such funds, securities, and deposits, including interest from November 14, 1979, at commercially reasonable rates, to the Federal Reserve Bank of New York, to be held or transferred as directed by the Secretary of the Treasury.

Section 1–102(b) and (c) of Executive Order 12279 provide as follows:

> (b) All rights, powers and privileges relating to the properties described in § 101 of this Order and which derive from any attachment, injunction, other like proceedings or process, or other action in any litigation after November 14, 1979, at 8:10 a. m. E.S.T., including those derived from Section 535.504 of the Iranian Assets Control Regulations, other than rights, powers, and privileges of the Government of Iran and its agencies, instrumentalities, and controlled entities, whether acquired by court order or otherwise, or nullified, and all persons claiming any such right, power, or privilege are hereafter barred from exercising the same.
>
> (c) All persons subject to the jurisdiction of the United States are prohibited from acquiring or exercising any right, power or privilege whether by court order or otherwise, with respect to the properties (and any income earned thereon) referred to in Section 1–101 of this Order.

The Secretary of the Treasury is delegated authority to carry out the terms of the Order (Section 1–105) and by its terms the order is effective immediately (Section 1–106). Further, Section 1–103 provides that compliance with the Order by any domestic bank is a discharge of any liability arising out of such compliance.

As recounted in the findings of fact above, EDS has secured a pre-judgment attachment on assets of the defendant Government of Iran, and funds sufficient for the execution of the judgment are held in the custody of the U.S. Marshal in Marine Midland Bank in New York. A final judgment has been entered in this action. Although judgment is currently on appeal before the Fifth Circuit Court of Appeals, the Defendant Government of Iran has not executed a supersedeas bond and there has been no stay of execution, EDS asserts that the executive order requires the Marine Midland Bank to transfer the assets held in the custody of the Marshal immediately to the New York Federal Reserve Bank. EDS further complains that should this transfer take place, there will remain no assets upon which this Court's judgment can be executed.

The Federal Defendants assert that a stipulation entered into between EDS and Marine Midland Bank in Cause No. 79–1711 in the District Court for the Southern District of New York (Defendant's Exhibit 2) militates against a finding of irreparable harm. The stipulation provides that Marine Midland Bank "shall not transfer, or purport to transfer, such funds, or take any other action affecting the status of such funds, without prior reasonable notice to the Plaintiff, providing effective opportunity for Plaintiff to take appropriate action." If anything, this agreement merely illustrates the irreparable harm which EDS would suffer were Marine Midland Bank to comply with Executive Order 12279. Although the stipulation provides EDS some comfort, it simply does not eliminate the potential irreparable harm which EDS would suffer were the assets to be transferred. In short, Marine Midland Bank is not precluded from transferring the assets in compliance with the Executive Order.

The Federal Defendants also argue that the agreements entered into between the United States and the Government of Iran (but not Executive Order 12279) require further implementation through regulations of the Treasury Department as well as possible Executive Orders. In essence, the Federal Defendants ask this Court to speculate as to future Treasury Regulations or Executive Orders which may abate the harm of which EDS complains. Executive Order 12279 is by its own terms "effective immediately" and appears to be self-implementing. It is well established that Executive Orders issued pursuant to either statutory or constitutional authority are given the force and effect of law. *Legal Aid Society of Alameda County v. Brennan*, 381 F.Supp. 125, 130 (N.D.Cal.1974). The stated objective of the Executive Order is clear. The Marine Midland Bank is compelled to transfer the assets which are the subject of this action to the Federal Reserve Bank of New York. The fact that the new administration may issue subsequent Executive Orders or Treasury Regulations which abate

the harm which EDS complains of is irrelevant.

The Federal Defendants have represented to this Court in a hearing on their motion for a continuance or stay that the United States will not subject any person or entity to civil or criminal proceedings for maintaining the status quo with regard to the assets in question through February 26, 1981. They argue that as a consequence, the issuance of a preliminary injunction is not necessary. In essence, what the United States has represented is that it will not enforce civil or criminal penalties against the Marine Midland Bank if it fails to comply with Executive Order 11279. Nevertheless, Marine Midland Bank is not prohibited from complying with Executive Order 11279. This argument simply bolsters the contention of EDS that Executive Order 11279 is self-implementing and effective immediately. The Federal Defendants similarly argue that the Executive Order does not set a date certain for compliance and also that the agreements between the United States and the Government of Iran do not require the ultimate transfer of the assets until within six months of the signing of the agreement. Once again, it is clear that the immediate transfer of the assets is not precluded. Finally, the Federal Defendants argue that the new administration has not yet had time to take a position with respect to the agreements and Executive Orders arising out of the hostage crisis. Implicit in this statement is the argument that irreparable harm which EDS is subject to as of this date might abate as a result of the subsequent position taken by the new administration. Once again, the Federal Defendants ask this Court to speculate as to future events which may or may not abate the harm to which EDS is currently subject. This the Court will not do.

In sum, I conclude that EDS will suffer immediate and direct irreparable harm should this Court decline to grant its application for a preliminary injunction. In support of my conclusion, I note that EDS has alleged a deprivation of due process of law as a consequence of Executive Order 11279. The Courts and authorities agree that "when an alleged deprivation of a constitutional right is involved, ... no further showing of irreparable injury is necessary." 11 Wright & Miller, Federal Practice and Procedure, § 2948 at 440, and cases cited therein.

2. The Relative Lack of Harm to the Defendant from Issuance of the Injunction.

The Government has asserted two sources of injury which would result from the issuance of an injunction in the case at bar. First, they claim that an order enjoining the Secretary and the United States from enforcing Executive Order 12279 with respect to the funds held on deposit in Marine Midland Bank would be an undue interference with the implementation of sensitive foreign policy. Yet, the Government has also taken the position that it is awaiting the formulation of new policies by the new administration. Therefore, it is unclear that there is any "sensitive foreign policy" with which to interfere. When the new administration takes a position with respect to the agreements entered into between United States and Iran and the Executive Orders issued pursuant to those agreements, it may move to have the limited injunctive relief prayed for by EDS vacated. A further consideration is the unique status of EDS vis-a-vis other creditors of and claimants against the Government of Iran. EDS perfected its pre-judgment attachment of the funds in the Marine Midland Bank prior to the implementation of the Iranian Assets Control Regulations on November 14, 1979. Finally, the agreements between the United States and Iran do not call for the completion of the transfer of the assets enunciated in Section 1–101 of Executive Order 12279 until six months from January 19, 1981. I am ever mindful of and sympathetic to the President's need to carefully assess the Algerian accords in order to enable him to formulate the administration's ultimate position with regard to their implementation. Nonetheless, it is my view that a preliminary injunction will not impede such process nor occasion any real harm to the Government of the United States. On the other hand, if precipitous action did occur, the asserted harm to the Government of the United

States would pall in comparison to the very real harm that EDS would suffer.

The Federal Defendants make the additional argument that the issuance of a preliminary injunction at this time would prevent the Secretary of the Treasury from issuing additional regulations pursuant to the delegation set forth in Executive Order 11279. This argument, of course, depends to some degree on the scope of the injunction. EDS seeks only to have the Secretary of the Treasury and Government of the United States enjoined from taking any action to implement the clearly stated objective of Executive Order 12279 solely with respect to EDS and the Marine Midland Bank. Once again, the harm asserted by the Government of the United States and the Secretary of the Treasury is speculative and not concrete. Therefore, I conclude that the relative harm to the United States of an injunction at this stage is minimal, speculative, and outweighed by the direct and immediate irreparable harm which the Plaintiff EDS would suffer if the injunction were not to issue.

3. The Impact of Injunctive Relief Upon the Public Interest.

The third factor which the equity jurisprudence of this Circuit compels this Court to examine is the impact that the injunctive relief prayed for in this action would have upon the public interest. Although I find this factor to be necessarily intertwined with the balance of harms among the respective parties, as well as with the final factor, the likelihood that Plaintiff will prevail on the merits, I treat the issue as the parties have characterized it in their briefs. EDS takes the position that the issuance of an injunction in this action is necessary for the preservation of constitutional rights of litigants to due process as well as the preservation and integrity of the Judicial Branch. In support of their position, they cite the district court opinion in *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F.Supp. 569, 579 (D.D.C.), *aff'd* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). In *Youngstown*, the District Court decided the issue of the constitutionality of the President's Executive Order prior to analyzing the impact of injunctive relief upon the

public interest, an analysis which this Court does not undertake at this time. After concluding that President Truman's Executive Order directing the Secretary of Commerce to take possession of certain steel manufacturing plants was unconstitutional, the Court recognized the strong public interest in adherence to "government as it is known under the Constitution." *Id.* at 577. In conjunction with this aspect of the public interest, I note that both the orders and judgments of this Court, and the orders of the Southern District of New York in aid of ultimate satisfaction of this judgment were rendered pursuant to jurisdiction conferred by Congress in the Foreign Sovereign Immunities Act (hereinafter "FSIA"), 28 U.S.C. §§ 1330, 1602, et seq. Further, Article III of the United States Constitution provides that judicial power of the United States "shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish." It could not be any clearer than that the judgment and orders of this Court as well as the orders of the Southern District of New York were rendered pursuant to Constitutional and statutory authority. If I assume that the judgment entered in this case is a valid, subsisting judgment, which I think I must, then Executive Order 12279 raises serious constitutional issues with regard to the power of the Executive Branch to nullify or negate the constitutional and statutory authority of Article III Courts with respect to pending cases. As one court has stated, it must "be assumed that the Constitution is the ultimate expression of public interest." *Llewelyn v. Oakland County Prosecutor's Office*, 402 F.Supp. 1379 (E.D.Mich.1975).

It is well established that the public interest may be declared in the form of a statute, in addition to the mandate of the Constitution. See 11 Wright & Miller, Federal Practice & Procedure, § 2948 at 460 and cases cited therein. EDS takes the position that the "All" Writs Act, 28 U.S.C. § 1651 provides just such a statutory statement of the public interest with respect to this case. Section 1651 states that

(a) The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

The power conferred by the "All" Writs Act extends under appropriate circumstances, to persons, who though not parties to the original action or engaged in wrong doing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice." *United States v. New York Telephone Co.*, 434 U.S. 159, 174, 98 S.Ct. 364, 373, 54 L.Ed.2d 376 (1977). The Supreme Court in *New York Telephone Co.* similarly stated that "[t]his Court has repeatedly recognized the power of a federal court to issue such commands under the "All" Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *Id.* at 172, 98 S.Ct. at 372. It is beyond purview that the powers granted by Congress under Section 1651 include the powers to issue an injunction when necessary to effectuate the Court's orders and judgments. *Id.; Toledo Scale Co. v. Computing Scale Co.*, 261 U.S. 399, 426–27, 43 S.Ct. 458, 67 L.Ed. 719 (1923). Further, "[i]t is axiomatic that the jurisdiction of the district court is not exhausted by the entry of a judgment, but rather continues until the judgment is satisfied." Plaintiff's Brief in Support of Application for Preliminary Injunction at page 14 and cases cited therein. It must be concluded then that Congress has expressed a strong public interest favoring the power of Federal Courts to protect the exercise of their jurisdiction and the effectuation of valid judgments.

In support of its position that the issuance of an injunction would harm the public interest the Government asserts that injunctive relief would interfere with the implementation of sensitive foreign policy and the diplomatic task of resolving an international crisis. They cite *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1952). In particular, they point to the *Baker* Court's discussion of justiciability and the political question doctrine. I have previously emphasized that the limited injunctive relief prayed for by EDS would have only a minimal impact upon the execution and implementation of foreign policy by the Secretary and the new administration. I note also that the issues in this case are not such that the factors enumerated in *Baker* with respect to the determination of "political questions," Id. at 217, 82 S.Ct. at 710, dictate non-judiciability. In *Baker*, the Supreme Court stated:

Yet it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance. Our cases in this field seem invariably to show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action.

*Id.* at 211, 82 S.Ct. at 706. Hence, I conclude that the public interest will be advanced by the issuance of limited injunctive relief in this action. Once again, however, I emphasize that this determination is inseparable from the issues of relative harm to the respective parties from the issuance of an injunction, and from the serious constitutional questions which Plaintiff's application for an injunction has raised.

4. The Probability that the Plaintiff Will Ultimately Succeed on the Merits.

EDS asserts four distinct arguments going to the merit of its claims. First, it asserts that the Executive Order was not validly promulgated. Second, it asserts that the United States-Iran declarations and implementing documents are not applicable by their terms to the assets subject to the pre-judgment attachment issued by the District Court for the Southern District of New York. Third, EDS asserts that even if the declarations and Executive Order 12279 applied to the funds held in the custody of the U.S. Marshal in the Marine Midland Bank, Executive Order 12279 is devoid of statutory authority. Finally, EDS claims

that if the Executive Order is applicable to the assets in question and is otherwise valid, it is unconstitutional. At the outset, I note that the Federal Defendants have declined to address the merits of Plaintiff's claims. See Federal Defendants' Memorandum in Opposition to Application for Preliminary Injunction at page 7, n.6. I review these claims under the well established standards set forth by the Court of Appeals for the Fifth Circuit; Plaintiff must show a "substantial likelihood that it will ultimately succeed on the merits." *E. g. Canal Authority supra*, at 572.

(a) The Validity of Executive Order 12279.

It is undisputed from the evidence that on January 19, 1981, Jimmy Carter, while President of the United States, signed Executive Order 12279. Under the Declaration, the action provided for in said Executive Order was not to take effect until certification by the Government of Algeria that the fifty-two United States hostages had safely departed from Iran. The parties agree that this event did not occur during the Carter Presidency. On January 20th, 1981, Ronald Reagan assumed the office of President of the United States of America, and shortly thereafter at approximately 12:35 p. m., Eastern Standard Time, American diplomatic and other personnel were released from captivity in Iran. Executive Order 12279 was first filed at the office of the Federal Register on January 22, 1981, and first published in the Federal Register on January 23, 1981. The Executive Order has never been signed by Ronald Reagan, President of the United States.

EDS argues persuasively that at the time the Executive Order was validated, Jimmy Carter was no longer President of the United States and accordingly that the Order is without legal effect. In support of its position, EDS cites §§ 1505(a) and 1507 of Title 44 of the United States Code, entitled Public Printing & Documents. EDS also cites the 20th Amendment to the United States Constitution. Section 1505 of Title 44 provides that Executive Orders having general applicability and legal effect shall be published in the Federal Register. Section 1507 provides that the document required

by Section 1505(a) to be published in the Federal Register is not valid as against a person who has not had actual knowledge of it until the duplicate originals or certified copies of the document have been filed with the Office of the Federal Register and a copy made available for public inspection as provided by Section 1503 of Title 44. The Twentieth Amendment to the United States Constitution provides that "[t]he terms of the President and Vice-President shall end at noon on the twentieth day of January, . . . ." Although Executive Order 12279 states by its own terms that it is "effective immediately" (see Section 1–106), EDS offers another version of Executive Order 12279 which was signed by President Carter on January 18th (which was never published in the Federal Register) to illustrate its point that the Order could not have been effective immediately upon the signing by the President (See Exhibit J to Plaintiff's Brief in Support of Application for Preliminary Injunction). Moreover, EDS argues that Point Three of the Declaration entered into between the United States and Iran stipulates that the issuance of Executive Order 12279 was expressly contingent upon the occurrence of an event which did not transpire during Mr. Carter's term of office: certification by Algeria that the 52 American hostages had "safely departed from Iran". EDS contends that "though presigned and dated, the Order was at best a possible future act when President Carter left office."

This issue raises a unique and novel question of law. The Court has been unable to find any case authority directly in point and the parties have not cited the Court to any such authority. The mandate of the Twentieth Amendment to the Constitution, however, as well as the sequence of events leading to the promulgation of Executive Order 12279 indicate that there is a substantial likelihood that the Executive Order was not validly promulgated during President Carter's term of office. Therefore, I conclude that Plaintiff has shown a substantial likelihood of success on the merits.

(b) The United States-Iran Declarations and the Implementing Documents are not Applicable to the Instant Case.

EDS seeks a declaratory judgment that the Declaration between the United States and Iran as well as Executive Order 12279 are not applicable to the assets which are the subject of a pre-judgment attachment entered prior to the promulgation of the Iranian Assets Control Regulations, 31 C.F.R. Part 535, on November 14, 1979. On June 13, 1979, the District Court for the Southern District of New York entered an order providing for the pre-judgment attachment of Iranian funds and directed the United States Marshal to take custody of those funds in the Marine Midland Bank. EDS argues that the statement of general principles in the Declaration entered into between the United States and Iran evidences the intent of the parties to "restore the financial position of Iran, insofar as possible, to that which existed prior to November 14, 1979." EDS also suggests that the Executive Order is applicable only to funds which were frozen as a consequence of the Iranian Assets Control Regulations on November 14, 1979. EDS points to language in Executive Order 12279 to the effect that the Order was issued to implement the agreements with the Government of Iran, as reflected in the Declaration. In addition, EDS places emphasis upon Section 1–102(b) of the Order which is set forth in full above. Although Section 1–102(b) can arguably be construed to include only those "rights, powers, and privileges relating to the properties described in Section 1–101 . . . which derive from any attachment, . . . after November 14, 1979," the Court is of the opinion that such a reading of the Order is tenuous. Despite the fact that Executive Order 12279 is not a picture of clarity, it appears that a proper construction of the Order is that it encompasses all the assets legally or beneficially owned by the Government of Iran which are in the possession of any United States banking institution. The basis for this construction is Section 1–101 and Section 1–102(c) of the Order. Therefore, I conclude that Executive Order 12279 is by its terms applicable to the funds held in the Marine Midland Bank. Although a part of Executive Order 12279 (in conjunction with the statement of General Principles in the Declaration entered into between the United States and Iran) is susceptible to the construction urged by EDS, the balance of the language in the Order indicates a contrary construction. With respect to this issue then, I conclude that EDS has not shown a substantial likelihood that it will ultimately prevail on the merits.

(c) Even If Applicable to EDS, The Executive Order is Devoid of Statutory Authority.

Executive Order 12279 cites as statutory authority for its directives the International Emergency Economic Powers Act (hereinafter "IEEPA"), 50 U.S.C. § 1702 and an 1868 statute, 22 U.S.C. § 1732. EDS argues that neither of these statutes supports the powers asserted in the Executive Order.

The IEEPA grants the President the powers set forth in Section 1702 to "deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat". 50 U.S.C. § 1701(a). To the extent that this condition is satisfied, Section 1702(a)(1) of the Act provides that

the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—

(A) investigate, regulate, or prohibit— (i) any transactions in foreign exchange, (ii) transfers of credit or payments between, by, through or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof, (iii) the importing or exporting of currency or securities; and

(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest;

by any person, or with respect to any property, subject to the jurisdiction of the United States.

Congress passed the IEEPA in 1977 to replace the peacetime authority for Presidential action in emergencies that previously existed in Section 5(b) of the Trading With the Enemy Act—the statute criticized by Congress for having "become essentially an unlimited grant of authority for the President to exercise at his discretion, broad powers in both the domestic and international economic agreement without Congressional review." H.R.Rep. No. 459, 95 Cong., 1st Sess. 7 (1977). With the IEEPA, Congress substituted a more limited set of powers limited to the regulation of international economic transactions. Id. at 10–11. The grant of authorities under IEEPA expressly excluded certain authorities granted to the President under Section 5(b) of the Trading With the Enemy Act including "the power to vest, i. e., to take title to foreign property." Id. at 15; S.Rep. No. 466, 95 Cong., 1st Sess. 5 (1977); U.S.Code Cong. & Admin.News 1977, p. 4540, hereinafter "S.R."). Thus, it is clear that under the authority of IEEPA the President may "freeze but not seize" assets in which a foreign nation has an interest. Although EDS asserts that IEEPA makes no reference whatsoever to attachments, court orders or other exercises of a court's jurisdiction, the plain language of sub-part (B) of Section 1702 grants the President authority to nullify or void the exercise of any right, power, or privilege with respect to any property in which a foreign country or national has any interest.

Executive Order 11279 directs and compels the transfer of Iranian funds in the possession of banking institutions. "[T]o the Federal Reserve Bank of New York, to be held or transferred as directed by the Secretary of the Treasury." In essence, the Order directs that the funds in which Iran has an interest be transferred to the control of the Executive Branch and attempts to vest custody and control of the assets in the Executive. This is a power which Congress declined to grant to the President with the enactment of IEEPA in 1977. Therefore, insofar as the Executive Order attempts to vest custody and control of the assets in question in the Executive Branch, such a directive is without Congressional authority. In addition, any claim that the language of Section 1702 was intended to limit or nullify the jurisdiction of Article III Courts was effectively refuted in a recent decision involving the Iranian Assets Control Regulations. In *National Airmotive Corporation v. Government State of Iran,* 499 F.Supp. 401, 404–05 (D.D.C.1980), the Court refused to accept the interpretation of the Government of the United States that Section 504(d) of the Freeze Regulations 31 C.F.R. 535.504(b) precluded further judicial proceedings. Citing "the familiar canon that a construction involving unconstitutionality is to be avoided if at all possible", the Court stated that the Government's interpretation would give rise to grave Constitutional difficulties:

A bar on judicial consideration of Plaintiff's claims on the basis proposed by the Government would legitimize an attempt on the part of the Executive Branch, through Treasury Regulations, to limit the jurisdiction of the federal courts. Whether Congress itself could restrict federal court jurisdiction by statute remains an unanswered question of the type that the courts are reluctant to explore 'absent the clearest indication that such was the intent of Congress.' Whatever may be the authority of the Congress in this regard, it has rarely, if ever, been suggested that an Executive Agency may, by regulation, bar the courts from operating with respect to particular subject matters. The Constitutional difficulties that would be raised by an attempt to impose such a bar are too numerous to catalog or explore here.

*Id.* at 405 (citations omitted).

I likewise conclude that despite the language in § 1702 that the President may nullify or void the exercise of any right, power or privilege with respect to property in which a foreign country or a national thereof has any interest, Congress could not and did not intend to grant the President power to nullify or void valid exercises of the judicial power by Article III Courts.

Therefore, I conclude that the directives of Executive Order 12279 do not fall within the powers granted to the President by IEEPA.

As stated above, Executive Order 12279 also relies upon 22 U.S.C. § 1732 as authority for its directives. Section 1732, enacted in 1868, and entitled "Release of Citizens imprisoned by foreign governments," provides that:

> Whenever it is made known to the President that any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government, it shall be the duty of the President forthwith to demand of that government the reasons of such imprisonment; and if it appears to be wrongful and in violation of the rights of American citizenship, the President shall forthwith demand the release of such citizen, and if the release so demanded is unreasonably delayed or refused, the President shall use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release; and all the facts and proceedings relative thereto shall as soon as practicable be communicated by the President to Congress.

The aging statute has seldom attracted the attention of the courts. It is most often characterized as a mandate by Congress that the President afford assistance to American citizens in trouble abroad. *Worthy v. Herter*, 270 F.2d 905, 910 (D.D.C. 1959); *Narenji v. Civiletti*, 481 F.Supp. 1132, 1141 n. 7 (D.D.C.1979), rev'd on other grounds, 617 F.2d 745 (D.C.Cir.1979), *cert. denied*, 446 U.S. 957, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980). In *Worthy, supra,* the Court indicated that the instrumentalities which the President must use to fulfill this Congressional mandate are "diplomatic or foreign-service consular." It has never been suggested that the statute vests the Executive Branch with the power to nullify valid orders and judgments of the Judicial Branch. As I have concluded with respect to the IEEPA, I similarly conclude that Congress could not and did not intend with the enactment of Section 1732 to grant the executive power to nullify valid orders and judgments of Article III Courts issued pursuant to the Foreign Sovereign Immunities Act. Thus, the Plaintiff has made the requisite showing of substantial likelihood of success on the merits with respect to this claim.

(4) If applicable, and otherwise valid, Executive Order No. 12279 is Unconstitutional.

I have alluded earlier in the course of this opinion to the serious constitutional questions which the application and execution of Executive Order 12279 raises. For the purposes of this application for a preliminary injunction, the constitutional issue must necessarily be characterized in two alternative forms. I have concluded above that Congress did not, with the passage of the IEEPA authorize the President to invalidate or void orders of Article III Courts issued pursuant to an express Congressional grant of jurisdiction under the Foreign Sovereign Immunities Act. The resolution of the constitutional issues in this context will thus be limited to the naked powers of the Presidency absent concurrence from Congress. In the event, however, that I am mistaken with reference to the intent of Congress as to the powers granted to the President under the IEEPA, then the constitutional issues must be examined in a different light. Prior to a discussion of these issues it is important to note the practical effect of Executive Order No. 12279 with regard to the posture of this case. The undisputed effect of the Order is such that the pre-judgment order of attachment issued by the District Court for the Southern District of New York is negated for all practical purposes. In addition, Executive Order 12279 effectively negates the judgment entered in favor of the Plaintiff by this Court. Therefore, the constitutional issues resolve to the power of either the Executive Branch or Congress to negate or countermand valid orders of Article III Courts issued pursuant to an express Congressional grant of jurisdiction under the Foreign Sovereign Immunities Act.

It is undisputed that the Executive Order directing the transfer of funds subject to the Plaintiff's pre-judgment attachment to

the custody of the Secretary of the Treasury was promulgated and published subsequent to the issuance of a final judgment by this Court. The directives of Executive Order 12279 by their express terms invalidate the pre-judgment attachment order issued in the Southern District of New York and in practical effect negate the final judgment issued by this Court. If the Order of pre-judgment attachment issued by the Southern District of New York as well as the final judgment issued by this Court are valid, then the pertinent inquiry is whether either Congress or the Executive can subsequently nullify those exercises of the judicial power. It is my conclusion that neither Congress nor the Executive have such authority, with the exception of certain limited instances not pertinent to the circumstances of this case. There is more than ample authority for the proposition that neither Congress, the Executive, an Executive Agency, nor a State Legislature may by subsequent acts negate, disregard, or nullify the judgment of the Court already rendered, or the rights determined thereby. *Chicago & Southern Airlines v. Waterman S. S. Corp.*, 333 U.S. 103, 113, 68 S.Ct. 431, 437, 92 L.Ed. 568 (1948); *Hodges v. Snyder*, 261 U.S. 600, 603, 43 S.Ct. 435, 436, 67 L.Ed. 819 (1923); *McCullough v. Virginia*, 172 U.S. 102, 123–24, 19 S.Ct. 134, 141–42, 43 L.Ed. 382 (1898); *United States v. Klein*, 80 U.S. (13 Wall.) 128, 147, 20 L.Ed. 519 (1872); *Pennsylvania v. Wheeling and Belmont Bridge Co.*, 59 U.S. (18 How.), 421, 431, 14 L.Ed. 249 (1856); *United States v. Peters*, 9 U.S. (5 Cranch), 115, 136, 3 L.Ed. 53 (1809); *Daylo v. Administrator of Veterans' Affairs*, 501 F.2d 811, 818 (D.C. Cir. 1974); *Hoyt Metal Co. v. Atwood*, 289 F. 453 (7th Cir. 1923); *Cerro Metal Products v. Marshall*, 467 F.Supp. 869, 877–78 (E.D. Pa.1979), aff'd, 620 F.2d 964 (3rd Cir. 1980). If such power were to be vested in coordinate branches of the Government, "the finality and independence of judicial action would be in jeopardy." *Cerro, supra* at 877. Article III of the United States Constitution and the Congressional grant of jurisdiction in the Foreign Sovereign Immunities Act provided this Court with the judicial power to adjudicate the issues in this case. Concomitant with that power is the power and duty of this Court to see that its orders and judgments are effectuated. Therefore, I am compelled to conclude that Executive Order 12279, with or without the blessing of Congress, is constitutionally invalid insofar as it attempts or purports to countermand or nullify valid exercises of the judicial power reflected by the judgment of this Court and attachment order of the District Court for the Southern District of New York.

█ The impact of Executive Order 12279 poses a similar and related constitutional issue concerning the power of either the Congress or the Executive to delimit the jurisdiction of Federal Courts. As stated above, the power to adjudicate the issues raised in this action derives from Article III of the Constitution and the Foreign Sovereign Immunities Act. It is well established that only Congress can confer and redefine the jurisdiction of United States Courts. *Palmore v. United States*, 411 U.S. 389, 401, 93 S.Ct. 1670, 1678, 36 L.Ed.2d 342 (1973); *Glidden Co. v. Zdanok*, 370 U.S. 530, 551, 82 S.Ct. 1459, 1473, 8 L.Ed.2d 671 (1962); *Lockerty v. Phillips*, 319 U.S. 182, 187, 63 S.Ct. 1019, 1022, 87 L.Ed. 1339 (1943). Therefore, Executive Orders lacking Congressional approval or authority cannot possibly interfere with the exercise of jurisdiction by Federal Courts. Even if Congress intended to grant the President authority to interfere with the exercise of jurisdiction of Federal Courts, I am of the opinion that there are limitations which Congress must observe in so doing. The foremost limitation on that power was succinctly delineated in *Battaglia v. General Motors Corporation*, 169 F.2d 254, 257 (2nd Cir.), cert. denied, 335 U.S. 887, 69 S.Ct. 236, 93 L.Ed.2d 425 (1948):

> We think, however, that the exercise by Congress of its control over jurisdiction is subject to compliance with at least the requirements of the Fifth Amendment. That is to say, while Congress has the undoubted power to give, withhold, and restrict the jurisdiction of Courts other than the Supreme Court, it must not so

exercise that power as to deprive any person of life, liberty or property without due process of law or to take private property without just compensation.

There can be little doubt but that EDS has a property interest in the judgment issued by this Court cognizable under the Fifth Amendment. *See Armstrong v. United States,* 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960). Executive Order 11279 appropriates to the custody of the Executive Branch funds held in the custody of a U.S. Marshal pursuant to a valid exercise of the judicial power. Executive Order 12279 further effectively deprives EDS of meaningful access to the Federal Courts which have been vested with jurisdiction under Article III of the Constitution and the Foreign Sovereign Immunities Act. Once again, I am compelled to conclude that, even with the blessing of Congress, this intrusion by the Executive Branch into the carefully designed contours of Federal Court jurisdiction is untenable under the Constitution of the United States.

With respect to any assertion that the directives of Executive Order 12279 are within the inherent or implied powers of the President as Commander-in-Chief, I note that the facts in this case closely resemble those in *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). I have concluded above that with the passage of IEEPA Congress expressly declined to preserve a power previously available to the President under the Trading With the Enemy Act—the power to vest custody and control of foreign assets in the Executive Branch. Likewise, in *Youngstown* Congress had expressly declined to grant the President the power to seize steel manufacturing plants during times of emergency. *Id.* at 585–586, 597–602, 72 S.Ct. at 865–866, 890–893. In the words of Justice Jackson (concurring)

> [w]hen the President takes measures incompatible with the expressed or implied will of Congress his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive Presidential control in such a case only by

disabling the Congress from acting upon the subject. Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system.

*Id.* at 637–38, 72 S.Ct. at 871. (Jackson J., concurring). Just as the Court in *Youngstown* concluded that President Truman was without statutory or constitutional authority to seize the nation's steel mills, I likewise conclude that President Carter was without statutory or constitutional authority to order the vesting of foreign assets in the custody and control of the Executive Branch.

In sum, I conclude that Executive Order 12279 suffers from serious constitutional deficiencies. It is my opinion that with the enactment of IEEPA, Congress did not intend to grant the President the power to (1) countermand or invalidate judgments of Article III Courts issued pursuant to any express Congressional grant of jurisdiction under the Foreign Sovereign Immunities Act, (2) to interfere with the valid exercise of Congressionally granted jurisdiction by Article III Courts, or (3) the power to vest foreign assets located in the United States in the custody and control of the Executive Branch. Nevertheless, if I am wrong with regard to the intended reach of IEEPA, I likewise conclude that the Act itself is not in harmony with the United States Constitution. Congress may, of course, repeal the Foreign Sovereign Immunities Act and eliminate the statutory basis for jurisdiction over future claims cognizable under that Act. Neither the President nor Congress, however, may be Executive fiat delimit jurisdiction already obtained and exercised.

Any Finding of Fact set forth herein which is a Conclusion of Law shall be deemed as such, and any Conclusion of Law which is a Finding of Fact shall be deemed as such.

E. Conclusion

I must once again emphasize that the federal Defendants have declined to brief the merits of the issues raised by the Plaintiff. Therefore, I decline to undertake the

analysis utilized by Judge Pine in *Youngstown Sheet & Tube Co. v. Sawyer,* 103 F.Supp. 569, 573 (D.D.C.1952), *aff'd* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). Thus, my findings relative to the validity of Executive Order 12279 under the pertinent statutes and the United States Constitution are preliminary, and not ultimate conclusions of law.

I have little difficulty in concluding that the Plaintiff has carried its burden in this proceeding and that the injunction prayed for should issue. I also believe that even under the heightened standard of review suggested by the federal Defendants (see part B supra) the Plaintiff has carried its burden. I am ever mindful that the grant of a preliminary injunction is a "drastic remedy" under the settled law of this Circuit but nonetheless conclude that the injunction which will enter in this action will have minimal impact upon the federal Defendants. Furthermore, because of the serious constitutional infirmities of Executive Order 12279 I believe that it is my duty to grant Plaintiff's prayer for relief. Congress expressly granted this Court jurisdiction to hear claims such as the Plaintiff's with the enactment of the Foreign Sovereign Immunities Act. Article III of the United States Constitution vests this Court with the judicial power to enter judgments and orders within the scope of Congressional grants of jurisdiction. I cannot ignore these principles and neither may the Executive. Neither can I acquiesce in an unwarranted intrusion into the powers of the Judicial Branch by Congress or the Executive. Congress is free to repeal the Foreign Sovereign Immunities Act, but the President may not do so by Executive fiat. In sum, I have concluded that the injunction must enter.

### PRELIMINARY INJUNCTION

On the 3rd day of February, 1981, came on to be heard the Application of Plaintiff Electronic Data Systems Corporation Iran for a Preliminary Injunction in its proceeding in aid of judgment in the above entitled and numbered cause. All parties hereto received due notice of said hearing in accordance with the Order setting Hearing on Application For Preliminary Injunction in Aid of Judgment entered on January 23, 1981, and appeared by counsel at said hearing.

Based on the Findings and Conclusions set forth in this Court's Memorandum Opinion of even date, the Court has determined that Plaintiff's Application for Preliminary Injunction should be Granted.

Accordingly, it is ORDERED THAT:

Defendants Donald T. Regan, the Secretary of the Treasury of the United States of America, and the United States of America, their officers, agents, servants, employees, and attorneys, and all persons acting in active concert or participation with them who receive actual notice of this Preliminary Injunction by personal service or otherwise, be and they are hereby, restrained during the pendency of this proceeding in aid of judgment from directly or indirectly taking any action of any nature whatever nullifying, impeding or interfering with, or in any other way affecting or relating to:

(1) The validity or enforcement of said Final Judgment issued by this Court or the attachment entered by the United States District Court for the Southern District of New York on June 13, 1979, for the purpose of securing said Final Judgment, including the transfer, purported transfer, or any direction to transfer, or the taking of any action in any way impeding or interfering with the availability to Plaintiff of, funds relating to said attachment; or

(2) The jurisdiction of this Court or any other federal court with respect to said Final Judgment, said attachment or said funds or Plaintiff's right to enforce its legal rights in United States Courts or by process of such courts.

This Preliminary Injunction does not prohibit said Defendants from promulgating regulations designed to implement Executive Orders 12276–12285 provided, however, that such regulations or other actions shall not have any of the effects prohibited herein.

It is FURTHER ORDERED that this Preliminary Injunction shall become effec-

tive only upon Plaintiff's execution and filing with the Clerk of the Court of a bond in accordance with law in the sum of $1000.00 conditioned that Plaintiff will abide the decision which may be made in this case and that it will pay all sums of money and costs which may be adjudged against it.